OHIO POWER COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Ohio Edison Company, Intervenor.

No. 83–1074.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1983.

Decided Sept. 14, 1984.

Albert X. Bader, New York City, with whom Edward J. Brady, New York City, was on the brief, for petitioner.

Lynn N. Hargis, Asst. Gen. Counsel, Federal Energy Regulatory Com'n, Washington, D.C., with whom Stephen R. Melton, Acting Gen. Counsel, and Jerome M.

Feit, Sol., Federal Energy Regulatory Com'n, Washington, D.C., were on the brief, for respondent.

George F. Bruder, Washington, D.C., was on the brief for intervenor.

James E. Hickey, Jr., Washington, D.C., also entered an appearance for intervenor.

Before TAMM and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Petitioner, Ohio Power Company (Ohio Power), seeks review of two orders of the Federal Energy Regulatory Commission (Commission).[1] In these orders, the Commission accepted the filing of a unilateral rate increase by intervenor, Ohio Edison Company (Edison), and denied Ohio Power's requests for a suspension of the rate increase and a hearing. We affirm the Commission's orders.

## I. BACKGROUND

Edison and Ohio Power are electric utilities that provide electricity to an Ohio corporation called Buckeye Power, Incorporated (Buckeye Power). Buckeye Power consists of rural electric cooperatives that, *inter alia*, provide long-term arrangements among members for the transmission and distribution of electricity. In 1968, Ohio Power drafted an Agreement with Edison, after extensive arm's-length bargaining, that stipulated the terms under which the two utilities would buy and sell power for transmission to Buckeye Power. *See* Joint Appendix (J.A.) at 1–19, 55, 57, 101. The Agreement, which had a duration of thirty-five years, was executed by both parties and approved by the Commission in June 1968. J.A. at 1, 11.

On March 30, 1982, Edison filed a proposed rate increase with the Commission

---

1. Ohio Power Co., 19 FERC ¶ 61,196 (May 28, 1982) (Order Accepting Rates for Filing, Granting Intervention, and Terminating Docket), Joint Appendix (J.A.) at 74–76; Ohio Power Co.,

21 FERC ¶ 61,095 (Nov. 22, 1982) (Order Denying Rehearing) [hereinafter cited as *Order Denying Rehearing*], J.A. at 124–32.

under section 205 of the Federal Power Act, 16 U.S.C. § 824d (1982). The filing sought to raise the transmission service rates Edison charged Ohio Power under the 1968 Agreement. J.A. at 32–34. Ohio Power protested the proposed rate increase, arguing that the Agreement permitted Edison to file rate increases only at five-year intervals and then only if Ohio Power agreed that the filing was appropriate. J.A. at 36, 38–39. Alternatively, Ohio Power contended that if the Commission accepted Edison's filing, the Commission should conduct a hearing and suspend the rate increase for five months. J.A. at 40.[2]

By order issued May 28, 1982, the Commission rejected Ohio Power's arguments and accepted Edison's filing. *Ohio Power Co.*, 19 FERC ¶ 61,196 (May 28, 1982) (Order Accepting Rates for Filing, Granting Intervention, and Terminating Docket), J.A. at 74–76. The Commission found that the Agreement authorized unilateral rate changes and further found that Edison's proposed rates were not excessive. *Id.* at 61,381, J.A. at 75, 76. After noting that Ohio Power had raised no factual ratemaking issues, the Commission ordered that the rates become effective June 2, 1982 without suspension and without a hearing. *Id.* at 61,381, J.A. at 76.

On June 28, 1982, Ohio Power applied for a rehearing claiming that the Commission had misinterpreted the 1968 Agreement and had erred in denying both a suspension and a hearing. J.A. at 77. On November 22, 1982, the Commission issued an order denying rehearing. *Ohio Power Co.*, 21 FERC ¶ 61,095 (Nov. 22, 1982) (Order Denying Rehearing) [hereinafter cited as *Order Denying Rehearing*], J.A. at 124–32. After examining the Agreement and the extrinsic evidence submitted by both parties, the Commission again concluded that the Agreement permitted unilateral rate increases at times other than five-year intervals after the effective date of the agreement. *Id.* at 61,291, J.A. at 131–32. The Commission also determined that a hearing was not necessary because it would provide no information other than that already submitted by both parties. *Id.* at 61,291, J.A. at 131. Finally, the Commission again denied Ohio Power's request to suspend the rate increase. *Id.* at 61,291, J.A. at 132.

■ On appeal, we are asked to resolve two issues: (1) whether the Commission correctly construed the 1968 Agreement, and (2) whether the Commission erred in refusing to grant Ohio Power a hearing on the meaning of the Agreement.[3]

---

**2.** Pursuant to 16 U.S.C. §§ 824d(c), (d) (1982), public utilities must file proposed rate changes with the Commission. After reviewing the filing, the Commission may either accept the filed rate without suspension, suspend the filed rate for up to five months, or reject it altogether. *Id.* §§ 824d(d), (e). The suspension provision protects the public from excessive rate increases by providing additional time for the Commission to analyze proposed rate changes. If the Commission is unable within the maximum suspension period to determine whether the proposed rates are reasonable, it may order the new rates into effect and require the utility to keep an accounting of amounts received. If the Commission subsequently determines the increased rates are not reasonable, it may order a refund of the charges found to be excessive. *Id.* § 824d(e).

**3.** Ohio Power also contends that it was unlawfully discriminated against as a result of the Commission's refusal to suspend the rate increase. Ohio Power asserts that a suspension was warranted because the Commission had imposed a five-month suspension on a rate in-

crease previously filed by Edison in which Edison had included cost-of-service data identical to that contained in the instant filing. *See* Ohio Edison Co., 18 FERC ¶ 61,010 (Jan. 8, 1982).

We find, however, that the Commission properly distinguished the previous filing from the instant filing. The previous filing had included proposed increases for both generation and transmission service rates. Although the proposed transmission service rates in the previous filing were cost-justified, the Commission found that the total proposed increases were excessive. The Commission therefore imposed a five-month suspension. By contrast, the instant filing included proposed increases for transmission rates alone. The Commission imposed no suspension here because it found that, consistent with Edison's previous filing, the proposed increases for the transmission rates were not excessive. *See Order Denying Rehearing,* 21 FERC ¶ 61,291 (Nov. 22, 1982), J.A. at 132. Ohio Power has proffered no facts to refute the distinction drawn by the Commission between these two filings. We are therefore able to reject summarily Ohio Power's discrimination

## II. ANALYSIS

The Supreme Court has held, in what has become known as the *Sierra-Mobile* doctrine, that only those rate filings consistent with a public utility's contract are lawful. *See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division*, 358 U.S. 103, 111–13, 79 S.Ct. 194, 199–200, 3 L.Ed.2d 153 (1958); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 343–44, 76 S.Ct. 373, 380, 100 L.Ed. 373 (1956). Ohio Power, Edison, and the Commission properly acknowledge that under the *Sierra-Mobile* doctrine the terms of the Agreement between Ohio Power and Edison must control the lawfulness of Edison's disputed rate filing. More specifically, the central question presented is whether the Agreement permits Edison to seek unilaterally a rate change at times other than five-year intervals following the effective date of the Agreement.

■ This court has deferred to the Commission's contractual interpretations in applying the *Sierra-Mobile* doctrine so long as that interpretation is "amply supported both factually and legally." *Kansas Cities v. FERC*, 723 F.2d 82, 87 (D.C.Cir.1983) (quoting *Memphis Light, Gas and Water Division*, 358 U.S. at 114, 79 S.Ct. at 200). Indeed, we have recently noted that it "would be foolish not to accord great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis." *Kansas Cities*, 723 F.2d at 87. Of course, we do not accord conclusive validity to the Commission's contractual interpretation. *Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 953 (D.C.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). After a thorough review of the Agreement and the parties' extrinsic evidence, we find the Commission's judgment sufficiently reasonable to warrant affirmance.

### A.

Sections 20 and 23 of the Agreement address Edison's and Ohio Power's authority to seek rate changes. Section 20 appears to contemplate rate changes by mutual agreement at five-year intervals.

> 20. *Review of Charges.* The charges specified herein shall be subject to review five years after the effective date hereof at the request of either party and at intervals of five years thereafter during the term of this Agreement, and shall be adjusted as deemed appropriate by the parties . . . .

J.A. at 11. Section 23 appears to permit a unilateral application to the Commission at any time to change any provision, including those pertaining to rates.

> 23. *Action before Regulatory Authorities.* Either party hereto may, upon delivery of prior written notice to the other, take such action before or make such filings with any regulatory authority having jurisdiction in respect of any term or provision of this Agreement as it shall deem appropriate and, in the event of any such action by either party hereto which effects or is intended to effect any change in any term or condition hereof, the terms and conditions of service hereunder shall be, except as provided in Section 14 hereof, the terms and conditions as so changed or as shall result from any ensuing action by or before any regulatory authority having jurisdiction.

J.A. at 12.

■ The Commission interpreted each clause to define an independent and meaningful aspect of the parties' contractual relation. By declining to find that either clause trumped the other, the Commission

---

claim because Ohio Power is not similarly situated to the party that received a suspension for the previous filing. *See Connecticut Light and Power Co. v. FERC*, 627 F.2d 467, 470–73 (D.C. Cir.1980). We express no opinion on the more difficult underlying issue of whether the Commission's refusal to suspend a rate increase un-

der § 205 of the Federal Power Act, 16 U.S.C. § 824d (1982), is reviewable in the context of a discrimination claim where the relevant parties are similarly situated. *See Cities of Carlisle and Neola, Iowa v. FERC*, 741 F.2d 429 at 433–434 n. 18 (D.C.Cir.1984).

complied with the cardinal principle that apparently contradictory clauses are to be reconciled by affording each the fullest meaning possible. *Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 929 (D.C.Cir.1979).

■ The Commission began its analysis by noting the clarity with which section 23 authorized both parties unilaterally to petition regulatory agencies at any time for a change in *"any* term or provision *of this Agreement." Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,289–90 (Nov. 22, 1982), J.A. at 127. Section 23 excepted neither those provisions pertaining to charges generally nor section 20 specifically, as it excepted section 14 of the Agreement, from those "terms" subject to unilateral amendment. The Commission concluded that only an express limitation, in section 20 or elsewhere in the Agreement, could qualify the parties' authority under section 23 to seek unilaterally at any time to alter the Agreement, including its rate provisions.[4]

■ The Commission next examined the text of section 20. Although section 20 requires bilateral review of charges at five-year intervals, it does not expressly preclude unilateral petitions for rate changes at times other than five-year intervals. That is, section 20 did not specify that charges would be subject to review *only* at five-year intervals and to adjustment *only* upon mutual agreement. Given the ease with which Ohio Power, the drafter of this Agreement, could have clarified the relation between sections 20 and 23, the Commission was justified in attributing significance to Ohio Power's omission of "only" in section 20.[5] *Barco Urban Renewal Corp. v. Housing Authority of Atlantic City,* 674 F.2d 1001, 1010 (3d Cir.1982); *Papago Tribal Utility Authority,* 610 F.2d at 928–29; Restatement (Second) of Contracts § 206 (1981). The Commission accordingly concluded that section 20 requires bilateral review of charges at least every five years but does not abrogate each party's authority under section 23 to review and adjust these charges more frequently.[6] We find the Commission's exam-

**4.** Ohio Power contends that the phrase, "terms and conditions," which appears three times in section 23, "is commonly used [in utility parlance] to describe terms of a tariff other than rates." Brief for Ohio Power at 18. The Commission, however, decided in its denial of rehearing that "terms and conditions" referred directly to the preceding phrase, "any term or provision of this Agreement." *Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,289–90 (Nov. 22, 1982). The Commission consequently concluded that "terms and conditions," even if frequently used as a term of art, was not meant as such in section 23. *Id.* Given the great deference due the Commission in identifying terms of art in the energy field and given the synonymous interchange in section 23 of "terms and conditions" for "any term or provision," we believe the Commission properly disposed of Ohio Power's argument. *See National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 169–70 & n. 41 (D.C.Cir.1982) (interpretation involving agency expertise or specialized judgment warrants increased deference).

**5.** The Commission was correctly guided by the rule that, in choosing among reasonable meanings of a contract, the meaning which operates against the drafter is to be preferred. We reject Ohio Power's assertion that this rule does not apply in cases of arm's-length bargaining among equals. Ohio Power, as a major utility in Ohio,

is fairly chargeable with the ability to state what it means. *Papago Tribal Utility Authority v. FERC,* 610 F.2d 914, 929 (D.C.Cir. 1979). We thus agree with the Commission that "an equal bargaining party—in this case a utility experienced in making rate filings before this Commission—can properly be held to the letter of the language it has itself drafted." *Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,291 (Nov. 22, 1982), J.A. at 130. *See* Restatement (Second) of Contracts § 206 comment a (1981).

**6.** Ohio Power contends the Commission has read contractual language similar to that in section 20 to preclude unilateral rate filings. *See Sam Rayburn Dam Electric Coop. v. FPC,* 515 F.2d 998, 1002–03 (D.C.Cir.1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). The Commission in its denial of rehearing distinguished *Sam Rayburn* in two respects. First, the contract in *Sam Rayburn* expressly provided that rate negotiations should occur *"not more often* than once every five years." Second, the *Sam Rayburn* contract did not provide, as does section 23 in the instant Agreement, that either party could make filings regarding *any* contractual term or provision. *Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,292 n. 22, J.A. at 130 n. 22. We find the factors cited by the Commission sufficient to distinguish the *Sam Rayburn* contract from the Agreement here at issue.

ination of the apparently contradicting sections thorough and its interpretation reconciling their terms entirely reasonable.[7]

■ Extrinsic evidence regarding the interpretation of a contract is considered when the meaning of the contract cannot be determined from its text and structure or from the application of canons of contract interpretation. *See Papago Tribal Utility Authority,* 610 F.2d at 929 n. 116; *City of Oglesby v. FERC,* 610 F.2d 897, 905 (D.C.Cir.1979). In such cases, extrinsic evidence is examined to discern the meaning that the parties intended to attribute to the ambiguous formulation. Because the intended meaning of the Agreement is apparent from a textual analysis of sections 20 and 23, the Commission was not required to consider the extrinsic evidence proffered by the parties. The evidence, however, is part of the record before us and accordingly warrants our review. On balance, we conclude the extrinsic evidence presented by the parties does not undermine the Commission's reasoned construction of the Agreement.

Ohio Power contends that the President and Secretary of Edison conceded in a submission to the Public Utilities Commission of Ohio (PUCO) that contract rates were subject to review only every five years. In 1967, Edison and Ohio Power filed a Joint Application and Petition to PUCO for approval of their Agreement pursuant to the Revised Code of Ohio. The Joint Application and Petition included one sentence regarding charges: "The Agreement contains a schedule of appropriate rates and charges, which are subject to review five years after the effective date thereof and at intervals of five years thereafter." Brief for Ohio Power at 22.

■ We do not find this sentence conclusive evidence that Edison understood the review and adjustment of rates to be governed exclusively by section 20. The sentence does not specify that rates are subject to review *only* at five-year intervals or that section 23 does not apply to rate changes. Additionally, the parties' failure to mention section 23 in this context does not necessarily imply that they believed it did not pertain to rate changes. The Joint Application and Petition to PUCO nowhere mentions section 23, yet even Ohio Power does not contend that section 23 fails to authorize unilateral filings to change non-rate provisions. We thus conclude that the Joint Application and Petition does not contradict the Commission's reasoned interpretation of sections 20 and 23.

Ohio Power further contends that communications it received from an Edison employee reflect Edison's understanding that section 20 was the sole means of modifying rates. In June 1975, J.F. Doering, the General Coordinator of Edison's Distribution Practices, wrote to Laurence Hoover, then Ohio Power's Tariffs, Rates, and Contracts Director. Mr. Doering requested that Ohio Power review, pursuant to section 20 of the Agreement, proposed increases in the

---

7. Ohio Power argues that because section 20 more specifically refers to rate changes than does section 23, section 20 must govern Edison's filing for a rate increase. We reject Ohio Power's argument for two reasons.

First, the rule of construction providing that specific clauses prevail over general clauses presumes that the clauses stand irreconcilably in conflict. *See Lincoln Pulp & Paper Co. v. Dravo Corp.,* 436 F.Supp. 262, 270 (D.Me.1977). Indeed, where both the specific and general provisions may be given reasonable effect, both are to be retained. *Colorado Milling & Elevator Co. v. Chicago, Rock Island & Pacific R.R. Co.,* 382 F.2d 834, 836–37 (10th Cir.1967). Here the Commission reasonably construed sections 20 and 23 to preserve for each an independent meaning. Because the two sections are not incompatible, we find no need for the "specific to prevail over the general."

Second, assuming *arguendo* that sections 20 and 23 are in conflict, it remains unclear which section provides the more specific command. Section 23, with clarity though perhaps not eloquence, affords each party an option to petition regulatory agencies for amendments. Section 23 also defines the bounds of that option by explicitly excepting section 14 from those terms subject to amendment. Section 20, in contrast, fails to specify whether the procedures prescribed therein for rate negotiations and changes are exhaustive. Given this ambiguity in section 20, we decline to find that section 20 constitutes "a more specific provision" than section 23.

transmission service charge. J.A. at 110. In response, Mr. Hoover requested cost-of-service data supporting Edison's proposed rate increases. J.A. at 118. The next communication on this matter apparently was transmitted some two and one-half years later. In November 1977, Mr. Doering informed Mr. Hoover that Edison was preparing cost-of-service data. He also indicated that discussions on revising the transmission service charge, which were agreed upon in 1975, should "proceed forthwith." J.A. at 120. Ohio Power argues that these communications indicate Edison's understanding that section 20 provided the sole means of adjusting rates.

Again, we do not find the extrinsic evidence inconsistent with the Commission's interpretation of sections 20 and 23. The communications imply that Edison viewed section 20 as one legitimate means to effect a rate adjustment. That Edison did not believe section 20 was the *only* means of changing rates was evidenced by Edison's filing a proposed rate change with the Commission just fifteen months after the 1977 correspondence. *See* Brief for Ohio Power at 23–24 & n. *. Additionally, neither party seemed to feel bound by the letter of section 20, at least with regard to the timing of rate discussions. The communications indicate that although discussions had not yet begun, Edison empha-

sized that new circumstances made their commencement in 1977 imperative. J.A. at 120. Even assuming for the purpose of argument that the Agreement became effective in 1970, as Ohio Power contends, a commencement of rate negotiations in 1977 would not have coincided with a five-year interval following the Agreement's effective date.[8]

In sum, we find ample support for the Commission's conclusion that sections 20 and 23 require rate negotiations at least every five years after the Agreement became effective, but also permit more frequent unilateral filings for rate changes. The extrinsic evidence presented by Ohio Power does not undercut the reasonableness of, and indeed may be read to support, the Commission's interpretation.[9]

## B.

Ohio Power also argues that the Commission was required to conduct a hearing to determine whether the Agreement permitted Edison unilaterally to file a rate increase at times other than five-year intervals after the Agreement's effective date. Ohio Power asserts that ambiguities in the Agreement necessitate an evidentiary hearing to inquire into the parties' intent at the time of contracting. We disagree.

---

**8.** Ohio Power cites two other letters from Mr. Doering to Mr. Hoover as extrinsic evidence that Edison understood section 20 to define the sole mechanism for rate changes. In the first letter, dated March 18, 1975, Mr. Doering suggests renegotiating section 20 "to permit more frequent review of such changes or, alternately, ... [to] allow for some mid-term adjustment ...." J.A. at 108. The second letter, dated June 26, 1975, proposed that section 20 should provide for review of charges at the request of either party at two-year intervals following August 1, 1975. J.A. at 110, 114.

Edison does not contend, however, that its authority to file unilaterally for rate increases ever derived from section 20. Moreover these letters do not undermine the Commission's finding that section 23 authorized Edison to seek unilateral rate increases. At most, Mr. Doering's letters indicate Edison's desire to promote bilateral, good-faith discussions on rate changes. Such a desire may illustrate no more than a preference to preserve good contractual rela-

tions with Ohio Power and to avoid the need to proceed unilaterally with the Commission.

**9.** Edison submitted an affidavit by its attorney, Frances McGovern, who negotiated the Agreement with Ohio Power. J.A. at 55. The affidavit explains Ms. McGovern's handwritten notes on a draft version of section 23 that was later adopted without change. The notes stated: "Ohio Power could file complaint. Ohio Edison could seek increases, etc.!" J.A. at 56. Ms. McGovern contended the notes meant that under section 23, Edison could file unilaterally for a rate increase under section 205 of the Federal Power Act, and Ohio Power could file a complaint regarding rates under section 206 of that Act. J.A. at 56. Though we, like the Commission, do not consider Ms. McGovern's notes persuasive, we do observe that the notes accord with the Commission's interpretation of sections 20 and 23. *See Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,292 n. 16 (Nov. 22, 1982), J.A. at 128 n. 16.

Although an evidentiary hearing generally is required for resolving issues of material fact, a hearing is not required to resolve issues of law. *Public Service Co. of New Hampshire v. FERC*, 600 F.2d 944, 955 (D.C.Cir.), *cert. denied,* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *Citizens for Allegan County, Inc. v. FPC*, 414 F.2d 1125, 1128 (D.C.Cir.1969). Questions of contract interpretation are issues of law if the interpretation need not derive either from the credibility of extrinsic evidence or from a choice among reasonable inferences drawn from extrinsic evidence. *See Pennsylvania Avenue Development Corp. v. One Parcel of Land in the District of Columbia,* 670 F.2d 289, 292 (D.C.Cir. 1981); Restatement (Second) of Contracts § 212(2) (1981). Because we find that the meaning of sections 20 and 23 was sufficiently clear from the text of the Agreement, we reject Ohio Power's contention that a hearing to examine the extrinsic evidence was required. To the extent that the Commission considered the extrinsic evidence, the evidence simply reinforced the Commission's resolution of the legal issue involved in this contract dispute. Ohio Power nevertheless seizes upon the Commission's examination of extrinsic evidence to argue that material issues of fact were in dispute and a hearing was therefore required. Ohio Power points to excerpts from the Commission's denial of a rehearing in which the Commission indicated that some of the extrinsic evidence was troublesome. *See Order Denying Rehearing,* 21 FERC ¶ 61,095 at 61,290, 61,291 (Nov. 22, 1982), J.A. at 128, 130. Assuming *arguendo* that ambiguity existed in the extrinsic evidence, resolving such ambiguity was not necessary to interpret the Agreement. Because consideration of the extrinsic evidence was not necessary to the Commission's decision, we will not upset the Commission's judgment that the value of a hearing would have been so slight as not to justify the commitment of Commission resources. *See Connecticut Bankers Ass'n v. Board of Governors,* 627 F.2d 245, 251 (D.C.Cir.1980) (agency need not conduct hearing unless a party demonstrates that hearing may serve a useful purpose).

### III. CONCLUSION

For the foregoing reasons, the Commission's orders are

*Affirmed.*