

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2000

# Sykes v. Apfel

Precedential or Non-Precedential:

Docket 99-5755

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Sykes v. Apfel" (2000). *2000 Decisions.* Paper 200.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/200

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 18, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5755

CLIFTON SYKES, SR., Appellant

v.

KENNETH S. APFEL, COMMISSIONER OF SOCIAL
SECURITY; FAITH S. HOCHBERG, UNITED STATES
ATTORNEY, DISTRICT OF NEW JERSEY; THE
HONORABLE JANET RENO, ATTORNEY GENERAL OF
THE UNITED STATES

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 98-cv-00105)
District Judge: Honorable Alfred M. Wolin

Argued: April 25, 2000

Before: BECKER, Chief Judge, WEIS, and
OAKES,*Circuit Judges.

(Filed: September 18, 2000)

_____

* Honorable James L. Oakes, United States Circuit Judge for the Second
Circuit, sitting by designation.

JON C. DUBIN, ESQUIRE (ARGUED)
Professor of Law
The State University
 of New Jersey
Rutgers School of Law –
 Newark
Urban Legal Clinic
123 Washington Street
Newark, NJ 07102

Counsel for Appellant

ROBERT J. CLEARY, ESQUIRE
United States Attorney
PETER G. O'MALLEY, ESQUIRE
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

BARBARA I. SPIVAK, ESQUIRE
Chief Counsel – Region II
STEPHEN P. CONTE, ESQUIRE
 (ARGUED)
Assistant Regional Counsel
MARIA FRAGASSI SANTANGELO,
 ESQUIRE
Assistant Regional Counsel
Office of General Counsel
Social Security Administration
26 Federal Plaza – Room 3904
New York, NY 10278

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

In this appeal, Clifton Sykes, Sr. challenges the judgment of the District Court affirming the Social Security Administration's final decision denying him disability benefits. The case compels us to revisit the use of the medical–vocational guidelines in the regulations

2

promulgated under the Social Security Act to establish that there are jobs in the national economy that a claimant can perform when the claimant has both exertional and nonexertional impairments.

After suffering several job-related injuries, Sykesfiled for Disability Insurance Benefits with the Social Security Administration. The Commissioner of Social Security ("Commissioner") found Sykes to be not disabled within the meaning of the Social Security Act. Sykes then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ concluded that Sykes had several severe impairments, at least one of which (left-eye blindness) is a nonexertional impairment under the regulations. The ALJ nevertheless denied Sykes's application. Applying the medical-vocational guidelines "as a framework" (and without referring to a vocational expert or other evidence), the ALJ concluded that Sykes's exertional impairments left him able to perform light work, and that the exclusion of jobs requiring binocular vision from light work positions in consideration of his nonexertional impairment did not significantly compromise Sykes's broad occupational base under the guidelines. The denial became a final decision when the Social Security Administration Appeals Council denied Sykes's request for a review of the ALJ's decision.

We conclude that, under Heckler v. Campbell, 461 U.S. 458 (1983) (construing the Social Security Act and upholding regulations promulgated thereunder), and in the absence of a rulemaking establishing the fact of an undiminished occupational base, the Commissioner cannot determine that a claimant's nonexertional impairments do not significantly erode his occupational base under the medical-vocational guidelines without either taking additional vocational evidence establishing as much or providing notice to the claimant of his intention to take official notice of this fact (and providing the claimant with an opportunity to counter the conclusion). Accordingly, we will reverse the order of the District Court and remand the case with instructions to return the case to the Commissioner for further proceedings. We reject Sykes's claim that the Social Security Administration has failed to acquiesce in this Court's prior decisions.

3

I.

Prior to filing for disability, Sykes worked for twenty-one years as a tractor-trailer operator. This work was physically strenuous, requiring on most days that Sykes load and unload seventy-five to eighty pound loads. During the course of his employment, Sykes suffered several injuries. In 1986, he tore the rotator cuff in his right shoulder while lifting steel off the side of the highway and putting it on his truck. This injury required surgery, and during his recovery Sykes was unable to work for nine months. Two years later, he injured his right arm and hand and had to take off two weeks to recover. In 1993, he re-injured his rotator cuff while binding steel to his truck. He underwent several months of physical therapy for this injury. Sykes also suffers from an obstructive pulmonary disorder and unstable angina, which cause him chest pain and which required hospitalization in 1993. The final blow to Sykes's employment as a tractor-trailer operator came when a bungee cord snapped as he was securing metal to his truck and ruptured the globe of his left eye. This injury left him permanently blinded in that eye.

Sykes never returned to work after the eye injury, and he filed for Disability Insurance Benefits with the Social Security Administration. In December 1994, the Commissioner found Sykes to be not disabled within the meaning of the Social Security Act, both in the initial determination and on reconsideration. Sykes then requested a hearing before an ALJ. Sykes complained of a variety of disabilities he characterized as severe: left-eye blindness, the inability to lift his right arm above the shoulder, angina, obstructive pulmonary disease, pain, and depression. The ALJ concluded that Sykes's depression was not severe, refused to credit his subjective complaints of pain, and determined that he could reach above his right shoulder. Applying the regulation governing the determination of disability, the ALJ found that Sykes had several severe impairments -- left eye blindness, the residual effects of a torn rotator cuff, angina, and obstructive pulmonary disease -- and that he could not perform his past work. He also concluded that Sykes was not disabled because there was other work in the national

4

economy that Sykes could perform. The Social Security Administration Appeals Council denied Sykes's request for a review of the ALJ's decision.

Sykes then filed a complaint in the United States District Court for the District of New Jersey seeking review of the ALJ's decision. He argued that the ALJ erred in relying exclusively on the grids in assessing whether there were jobs in the national economy that Sykes could perform when his impairments were both exertional and nonexertional. Sykes also challenged the ALJ's conclusions that he could lift his right arm above his shoulder and that his depression was not severe. The District Court affirmed the ALJ's decision upholding the Commissioner's denial of benefits, concluding that these assessments were supported by substantial evidence.

The District Court had jurisdiction over the final decision denying Sykes's benefits pursuant to 42 U.S.C.S 405(g). We have jurisdiction over this appeal from the final decision of the District Court pursuant to 28 U.S.C. S 1291. We review the factual findings of the Commissioner only to determine whether the administrative record contains substantial evidence supporting the findings. See 42 U.S.C. S 405(g); Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986) (even if the record could sustain an alternative conclusion, the ALJ's decision regarding disability will not be overturned as long as there is substantial evidence to support it). Our review of legal issues is plenary. See Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

II.

In addition to other requirements not at issue here, a claimant is entitled to total disability benefits under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. S 423(d)(2)(A). The Act contemplates that disability determinations will be

5

individualized and be based on evidence adduced at a hearing. See Heckler v. Campbell, 461 U.S. 458, 467 (1983) (noting that the Act requires individualized determination based on evidence adduced at a hearing); see also 42 U.S.C. S 405(b) (requiring consideration of each individual's condition and stating that an individual may request that a disability determination be based on evidence adduced at a hearing). The Act also gives the Social Security Administration authority to develop regulations implementing these provisions. See Campbell, 461 U.S. at 466.

The Social Security Administration has promulgated a five-step process for evaluating disability claims. See 20 C.F.R. S 404.1520 (1999). First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. 1 The claimant bears the burden of proof for steps one, two, and four of this test. The Commissioner bears the burden of

_____

1. The regulations direct the Commissioner to consider the four factors Congress has identified as relevant to the disability determination: physical ability, age, education, and work experience. See 42 U.S.C. S 423(d)(2)(A); 20 C.F.R. S 404.1520(f) (1999).

proof for the last step. See Bowen v. Yuckert , 482 U.S. 137, 146 n.5 (1987).2

Under the regulations, impairments can be either exertional or nonexertional. Impairments are classified as exertional if they affect the claimant's

> ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.

20 C.F.R. S 404.1569a (1999). All other impairments are classified as nonexertional. See id.

Prior to 1978, the Secretary of Health and Human Services relied on vocational experts to establish the existence of suitable jobs in the national economy for all claimants (the fifth step of the inquiry). After a claimant's limitations and abilities had been determined at a hearing, a vocational expert ordinarily would testify as to whether work existed that the claimant could perform. See Heckler v. Campbell, 461 U.S. 458, 461 (1983). In 1978, to improve both the uniformity and efficiency of this determination, the Secretary promulgated, through an administrative rulemaking, medical-vocational guidelines, or "grids," that establish the types and number of jobs that exist in the national economy for claimants with exertional impairments. See 20 C.F.R. pt. 404, subpt. P, app. 2 (1999). The grids consist of a matrix of four factors--physical ability, age, education, and work experience--and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.3 Where a

_____

2. Because step three involves a conclusive presumption based on the listings, no one bears that burden of proof. See Yuckert, 482 U.S. at 146–47 n.5.

3. Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes

claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform.4

In Campbell, 461 U.S. at 467, the Supreme Court held that the Secretary of Health and Human Services (now the Commissioner of Social Security) may rely on these grids to establish that jobs exist in the national economy that a person with the claimant's exertional limitations could perform.5 The claimant argued that the grids violated the Social Security Act because they failed to provide for the required individualized determination on the issue whether there were jobs in the national economy that the claimant could perform. The Supreme Court upheld reliance on the grids because, although the Social Security Act contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing, the statute "does not bar the Secretary from relying on rulemaking to resolve certain classes of issues." Id. The Court explained that "even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration." Id. (citing FPC v. Texaco Inc., 377 U.S. 33, 41-44 (1964); United States v. Storer Broad. Co., 351 U.S. 192, 205 (1956)).

The regulations require the Commissioner to make findings regarding the individual claimant's abilities and impairments on the basis of evidence adduced at a hearing and to afford claimants ample opportunity both to present

_____

of jobs--i.e., whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R.S 404.1567 (1999). Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects he must lift, and whether extensive movement, or use of arm and leg controls, is required. See id.

4. The claimant has an opportunity to rebut this conclusion. See Heckler v. Campbell, 461 U.S. 458, 467 (1983).

5. The Social Security Independence and Program Improvements Act of 1994, Pub.L. 103-296, 108 Stat. 1464, substituted the "Commissioner of Social Security" for the "Secretary" in a variety of subsections. See also 42 U.S.C.A. 403, at 80 (West Supp. 2000) (noting substitution).

evidence relating to their own abilities and to offer evidence that the guidelines do not apply to them. See id. at 467. The grids only apply to "an issue that is not unique to each claimant--the types and numbers of jobs that exist in the national economy. This type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing." Id. at 468 (citing American Airlines, Inc. v. Civil Aeronautics Bd., 359 F.2d 624, 633 (D.C. Cir. 1966) (en banc)); see also Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. 211, 228 (1991) (agency may establish general facts by a rulemaking even when the enabling statute requires the agency to hold a hearing).

The Court also considered in Campbell whether the use of the grids to establish the presence of jobs in the national economy violated legal standards for the administrative or official notice of facts, which require "that when an agency takes official or administrative notice of facts, a litigant must be given an adequate opportunity to respond." Campbell, 461 U.S. at 469; see also 5 U.S.C. S 556(e) (governing administrative notice). The Court rejected this argument, holding that

> [t]his principle is inapplicable [ ] when the agency has promulgated valid regulations. Its purpose is to provide a procedural safeguard: to ensure the accuracy of the facts of which an agency takes notice. But when the accuracy of those facts already has been tested fairly during rulemaking, the rulemaking proceeding itself provides sufficient procedural protection.

Campbell, 461 U.S. at 470 (emphasis added). This suggests that, in the absence of some procedural safeguard (such as a rulemaking), the Court would require that the Commissioner comply with the requirements for administrative notice even for issues "that [are] not unique to each claimant," id. at 468, such as the types and numbers of jobs that exist in the national economy for a claimant with exertional and nonexertional impairments. The Court was satisfied that the regulation setting forth the grids could substitute for an individualized determination because it was subject to procedural safeguards (in the

9

rulemaking) sufficient to ensure that the purposes of notice were served.

Sykes's appeal requires us to decide whether, under Campbell, and in the absence of a rulemaking establishing the fact of an undiminished occupational base, the Commissioner can determine that a claimant's nonexertional impairments do not significantly erode his occupational base under the grids without either taking additional vocational evidence establishing as much or providing notice to the claimant of his intention to take official notice of this fact (and providing the claimant with an opportunity to counter the conclusion). If the Commissioner cannot make such a determination consistent with Campbell and the Social Security Act, then the District Court order affirming the ALJ's decision must be reversed.

III.

Applying the five-step analysis described above, the ALJ concluded that (1) Sykes was not currently employed in substantial gainful activity; (2) that he had the following severe impairments (exertional and nonexertional): left-eye blindness, the residual effects of a torn rotator cuff, angina, and obstructive pulmonary disease; (3) that these impairments did not meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1999), and that Sykes retained the capacity to perform light work; (4) that Sykes lacked the residual functional capacity to perform his past work; and (5) that there were other jobs in the national economy that Sykes could perform.

In the fifth step of the test (for which the government bears the burden of proof), the ALJ did not consider any evidence in addition to the grids in making his determination that there were jobs in the national economy that Sykes could perform. Instead, applying the grids "as a framework" (and without referring to a vocational expert or other evidence), the ALJ concluded that there were jobs in the national economy that Sykes could perform because the exclusion of jobs requiring binocular vision from light work

10

positions did not, in his view, significantly compromise Sykes's broad occupational base for light work. The ALJ's decision states that "using medical-vocational`grid' rule 202.11, Table 1, Subpart P, Appendix 2, as a framework for decision-making, I find that jobs exist in significant numbers in the national economy that he has had the capacity to perform. The exclusion of jobs requiring binocular vision does not significantly compromise the broad base of light work."6

On appeal, Sykes challenges the ALJ's assessment of his depression; the ALJ's rejection of his subjective complaints of pain in his shoulder, chest, and arms; the conclusion that he could raise his right arm above his shoulder; and the conclusion that his impairments do not meet the criteria for listed impairments. We agree with the District Court that the ALJ's conclusions regarding Sykes's depression and about the listings were supported by substantial evidence.7 We do not believe, however, that the finding that Sykes can raise his right arm above his shoulder was supported by substantial evidence. Sykes testified that he could not, and no evidence contradicts this testimony.8 Additionally, the Commissioner failed to explain

_____

6. Dr. Goldfeder, who made several reports on Sykes's condition that are a part of the record, opined that Sykes could be employed as a one-eyed individual. We reject the Commissioner's contention that this opinion supported the ALJ's conclusion. Dr. Goldfeder is not a vocational exert, and his medical opinion cannot be considered vocational evidence that work is available to one-eyed individuals in the national economy.
7. Sykes has never been hospitalized for a mental condition, has never been prescribed psychotropic medication, and has never undergone therapy. Dr. Candela, a consultative psychiatrist for the Social Security Administration, assessed the severity of Sykes's mental condition as mild. Dr. Pollock, who examined Sykes four times over the course of several years, reported that Sykes's speech was coherent and logical and that there was no evidence of formal thought disturbance. He also opined that Sykes suffers from a disabling psychiatric impairment. But Pollock was not Sykes's treating physician. His opinion thus was not entitled to controlling weight. See 20 C.F.R. S 404.1527(d) (only a treating source's opinion on the issues of the nature and severity of an individual's impairment, if supported by medical evidence, is to be given controlling weight).
8. Indeed, in his brief in the District Court, the Commissioner appears to concede that this conclusion was in error, noting that the ALJ "inadvertently indicated that plaintiff could raise his right arm above his shoulder."

11

adequately his reasons for rejecting or discrediting evidence of Sykes's subjective complaints of pain.9  We will direct him to reconsider on remand the findings regarding these complaints.

The remaining (and key) question raised by Sykes's appeal is whether the Commissioner met his burden of proof for the step-five inquiry of establishing that there are jobs in the national economy that Sykes can perform given the impairments that the ALJ did accept. In Burnam v. Schweiker, 682 F.2d 456, 458 (3d Cir. 1982), we held that the Commissioner cannot meet this burden by relying exclusively on the grids when the claimant has both exertional and nonexertional impairments.10 At issue in this case is the scope of this limitation.

_____

9. The ALJ concluded that although Sykes had"underlying medically determinable impairments that could produce some of the pain and other symptoms alleged, the evidence does not reasonably support the intensity and the frequency asserted." The only explanation offered for this conclusion was that Sykes has only received"conservative treatment" for pain. This explanation is insufficient. The Commissioner's interpretation of the regulations regarding pain states that "[o]nce adjudicators determine that the individual has an impairment which is reasonably expected to produce some pain, they must consider all of the evidence relevant to the individual's allegations of pain, even if the alleged pain is more severe or persistent than would be expected." Evaluation of Symptoms, Including Pain, 56 Fed. Reg. 57,932 (1991) (interpreting regulations regarding the evaluation of symptoms including pain, 20 C.F.R. S 404.1529). Similarly, we have stated that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence, see Dobrowolsky [v. Califano], 606 F.2d [403,] 407 [(3d Cir. 1979)], and explain a rejection of the evidence." Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 435 (3d Cir. 1999) (citing Benton v. Bowen, 820 F.2d 85, 88 (3d Cir. 1987)). "Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Benton, 820 F.2d at 88. The Commissioner failed to meet this standard in evaluating Sykes's complaints of pain.
10. Hereinafter, we will discuss only those impairments that the ALJ determined to be severe, treating (as did the ALJ) the left-eye blindness as a nonexertional impairment and the other impairments as exertional impairments. We note, however, that on remand the ALJ should consider whether some aspects of the impairments that are identified are nonexertional. Sykes asserts that the residual effects of the torn rotator cuff and his pulmonary and cardiac conditions have nonexertional manifestations as well as exertional ones.

12

The government argues that the ALJ appropriately used the grids in this case "as a framework." According to the government, the ALJ properly looked to the jobs listed under light work and made an independent determination that Sykes's lack of binocular vision did not significantly diminish his residual functional capacity. The government argues that, under the Social Security Act and the regulations interpreting it, the ALJ can make the determination regarding disability and need not take additional vocational evidence if he determines that the nonexertional impairment does not significantly erode the occupational base of the category of work that the claimant can perform given his exertional impairments.

A. The Grids and Nonexertional Impairments

The Social Security Administration has promulgated regulations governing the determination of disability when the claimant has an impairment or combination of impairments resulting in both exertional limitations and nonexertional limitations. The regulation governing the assessment of nonexertional limitations provides that, if a finding of disability is not possible based on exertional limitations alone,

> the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in these combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

20 C.F.R. pt. 404, subpt. P, app. 2, S 200.00(e)(2) (1999). The government argues that, under this regulation, the ALJ need not refer to any additional evidence in determining

13

whether a nonexertional impairment erodes residual
functional capacity.

The courts of appeals agree at a general level that the
grids cannot automatically establish that there are jobs in
the national economy when a claimant has severe
exertional and nonexertional impairments.11 In Burnam v.

_____

11. See, e.g., Ortiz v. Secretary of Health and Human Servs., 890 F.2d
520, 524 (1st Cir. 1989) (per curiam) (where a claimant has
nonexertional impairments in addition to exertional limits, the grid may
not accurately reflect the availability of jobs such a claimant could
perform); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986) ("[I]f a
claimant suffers from additional `nonexertional' impairments, the grid
rules may not be controlling."); Coffman v. Bowen, 829 F.2d 514, 518
(4th Cir. 1987) (an ALJ may not rely solely on the grids where
"nonexertional limitations . . . occur in conjunction with exertional
limitations"); Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987) (when
the claimant has nonexertional impairments that significantly affect his
residual functional capacity, the ALJ may not rely exclusively on the
guidelines in determining whether there is other work available that the
claimant can perform); Abbott v. Sullivan, 905 F.2d 918, 926-27 (6th Cir.
1990) (when the claimant suffers from a nonexertional impairment
significantly restricting the range of available work, the grids may be
used only as a framework to provide guidance for decision making, and
not to direct a conclusion of nondisability); Warmoth v. Bowen, 798 F.2d
1109, 1112 (7th Cir. 1986) (per curiam) (when a claimant's nonexertional
impairments further restrict his range of employment opportunities,
application of the grids is precluded); Fenton v. Apfel, 149 F.3d 907, 910
(8th Cir. 1998) (the Commissioner must produce vocational expert
testimony concerning the availability of jobs that a person with a
claimant's particular characteristics can perform, if his or her
characteristics do not match those in the regulations); Cooper v.
Sullivan,
880 F.2d 1152, 1155-56 (9th Cir. 1989) (if the exertional impairments
alone are insufficient to direct a finding of disability, analysis in
addition
to the grids is required); Channel v. Heckler , 747 F.2d 577, 582 (10th
Cir. 1984) (per curiam) (without a "specificfinding, supported by
substantial evidence, that despite his non-exertional impairments, [the
claimant] could perform a full range of sedentary work on a sustained
basis, it was improper for the ALJ conclusively to apply the grids in
determining that [the claimant] was not disabled"); Swindle v. Sullivan,
914 F.2d 222, 226 (11th Cir. 1990) (per curiam) ("If [the claimant's] non-
exertional impairments significantly limit basic work activities, the ALJ
should not rely solely on the Grids and should take evidence from a
vocational expert to determine whether there exists in the national

14

Schweiker, 682 F.2d 456 (3d Cir. 1982), we rejected reliance on the grids in this situation because the medical-vocational grids do not "purport to establish the existence of jobs for persons . . . with both exertional and nonexertional impairments." Id. at 458; see also Washington v. Heckler, 756 F.2d 959, 967–68 (3d Cir. 1985) ("[G]iven the Secretary's failure to present any evidence of [the claimant's] ability to work independent of the prescriptions of the grids, a finding that appellant was not disabled is simply contrary to this Court's precedent."); Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983) (per curiam) ("Such an inappropriate reliance on the grid regulations to determine the disability of an individual with both exertional and non-exertional impairments would be contrary to Burnam.").

There is, however, considerable variety among the courts of appeals regarding the scope of the limitation on the use of the grids when a claimant has exertional and nonexertional impairments. Some cases from the other circuits have held that the bar on exclusive reliance on the grids in this situation is limited by the requirement that the nonexertional impairment invoked must be significant enough to limit further the range of work permitted by the exertional limitations (the residual functional capacity) before it precludes application of the grids. See, e.g., Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991) (per curiam) (noting law of circuit that the Commissioner may rely on the grids if the claimant's nonexertional impairment does not "significantly" affect his or her ability to perform the full range of jobs at the appropriate exertional level); Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (holding that if the guidelines adequately reflect a claimant's condition, using them to determine disability status is appropriate, "[b]ut if a claimant's nonexertional impairments significantly limit the range of work permitted

_____

economy a significant number of jobs for someone with [the claimant's] limitations"); Smith v. Bowen, 826 F.2d 1120, 1122 (D.C. Cir. 1987) (recognizing that "applying the grids to a claimant with nonexertional impairments may lead to an inaccurate finding that jobs exist that the claimant can perform").

15

by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments" (internal quotation marks omitted)); Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987) (when the claimant's nonexertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the guidelines in determining whether there is other work available that the claimant can perform); Warmoth v. Bowen, 798 F.2d 1109, 1112 (7th Cir. 1986) (per curiam) ("While a vocational expert's specialized knowledge undoubtedly would be helpful in the present case, this is not to say that testimony from such an expert is required in this and every other case involving a non-exertional impairment; rather, we only require that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." (citation omitted)); Channel v. Heckler, 747 F.2d 577, 582 n.6 (10th Cir. 1984) (per curiam) (holding that "the mere presence of a nonexertional impairment does not automatically preclude reliance on the grids"; rather, reliance on the grids is foreclosed only when the nonexertional impairment poses an additional limitation on the claimant's ability to perform a range of available jobs.).12

This described limitation on the rule against exclusive reliance on the grids when the claimant has exertional and nonexertional impairments significantly narrows the rule. It leaves the ALJ free to assess whether there is credible

_____

12. A finding under step two of the regulations that a claimant has a "severe" nonexertional limitation is not the same as a finding that the nonexertional limitation affects residual functional capacity. The cases cited above do not rely on the "severity" determination, but rather impose an additional requirement that the nonexertional impairment limit the capacity for work beyond the claimant's residual functional capacity, given the limitations imposed by the exertional impairment. See, e.g., Bapp, 802 F.2d at 606 ("By the use of the phrase `significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.").

16

evidence that the nonexertional impairment limits residual functional capacity before going off the grids, in effect allowing the ALJ to refer to the grids (and consider the medical evidence) to determine whether the nonexertional impairment is severe enough to make the grids inapplicable before considering any evidence in addition to the grids. See, e.g., Bapp, 802 F.2d at 606 ("Upon remand the ALJ must reevaluate whether the Secretary has shown that plaintiff's capability to perform the full range of light work was not significantly diminished [by his nonexertional impairments]. That initial determination can be made without resort to a vocational expert.").

The government's interpretation of 20 C.F.R. Part 404, Subpart P, Appendix 2, S 200.00(e)(2) (1999) in effect adopts this limitation on the rule barring exclusive reliance on the grids when the claimant has exertional and nonexertional impairments. In Washington v. Heckler, 756 F.2d 959 (3d Cir. 1985), we left open the possibility that the Commissioner could use the grids as a "framework" for determining the extent to which a nonexertional limitation may further diminish work capacity. See id. at 967-68. But the framework approach does not comport with Heckler v. Campbell, 461 U.S. 458 (1983), when it is defined as broadly as it is here.

The regulation provides that, where an individual has an impairment or a combination of impairments resulting in both exertional and nonexertional limitations, if afinding of disability is not possible based on exertional limitations alone, the grids "provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." 20 C.F.R. pt. 404, subpt. P, app. 2, S 200.00(e)(2) (1999). By comparison, the regulations governing a determination of disability when the claimant has solely exertional impairments direct a finding of disability without reference to additional evidence when the factors of the claimant's particular impairments coincide with the criteria of a rule:

> The existence of jobs in the national economy is reflected in the "Decisions" shown in the rules; i.e., in promulgating the rules, administrative notice has been

17

taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy, and very heavy) as supported by the "Dictionary of Occupational Titles" and the "Occupational Outlook Handbook," published by the Department of Labor; the "County Business Patterns" and "Census Surveys" published by the Bureau of the Census; and occupational surveys of light and sedentary jobs prepared for the Social Security Administration by various State employment agencies. Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established. However, the existence of such jobs for individuals whose remaining functional capacity or other factors do not coincide with the criteria of a rule must be further considered in terms of what kinds of jobs or types of work may be either additionally indicated or precluded.

20 C.F.R. pt. 404, subpt. P, app. 2, S 200.00(b) (1999).

As this comparison between the regulations makes clear, the only facts established in the grids are of unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels. The regulations do not purport to establish jobs that exist in the national economy at the various functional levels when a claimant has a nonexertional impairment (or does not meet the criteria of the rule for other reasons).

The Supreme Court upheld reliance on the grids to determine whether there are jobs in the national economy for claimants who have only exertional impairments because, even though the Social Security Act requires an individualized determination regarding disability, the agency had promulgated valid regulations identifying these jobs and the availability of jobs was an issue that did not require case-by-case determination. See Campbell , 461 U.S. at 467 (1983) ("[E]ven where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case determination."). The regulations still require an individualized hearing in which the claimant has

18

an opportunity to present evidence regarding his particular disabilities; the grids only apply to "an issue that is not unique to each claimant--the types and numbers of jobs that exist in the national economy. This type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing." Id. at 468 (citations omitted).

Like the availability of jobs for claimants with exertional impairments, the availability of jobs for claimants with exertional and nonexertional impairments may well be an issue that does not require case-by-case determination and may be fairly resolved through rulemaking. But the Social Security Administration has not promulgated regulations identifying jobs in the national economy for claimants with combined exertional and nonexertional limitations or identifying nonexertional impairments that are not significant enough to diminish a claimant's occupation base considering his exertional impairment alone. Campbell, by force of implication, requires such a regulation (or similar procedure establishing general facts) in order to direct a determination of disability without reference to individualized evidence that there are jobs in the national economy that the claimant can perform. Until the government takes steps to establish such general facts for claimants with exertional and nonexertional impairments, the government cannot satisfy its burden under the Act by reference to the grids alone.

At least one of our sister circuits has recognized that the determination whether the nonexertional impairment significantly erodes residual functional capacity cannot be made without reference to additional evidence. In Francis v. Heckler, 749 F.2d 1562 (11th Cir. 1985), a case also involving the loss of vision, the ALJ, after acknowledging that the claimant was limited to performing medium work requiring only gross vision, nevertheless applied the grids because he was "persuaded" that this impairment did not significantly limit the range of medium work available to claimant. The Eleventh Circuit reversed because "there [was] no vocational testimony upon which the ALJ could have relied to be so persuaded." Id. at 1567.

19

The Social Security Administration has not conducted a rulemaking establishing either that the lack of binocular vision does not significantly diminish the occupational base for light work or more generally establishing common facts applicable to individuals with Sykes's set of impairments. The grids establish, for exertional impairments only, that jobs exist in the national economy that people with those impairments can perform. When a claimant has an additional nonexertional impairment, the question whether that impairment diminishes his residual functional capacity is functionally the same as the question whether there are jobs in the national economy that he can perform given his combination of impairments. The grids do not purport to answer this question, and thus under Campbell  the practice of the ALJ determining without taking additional evidence the effect of the nonexertional impairment on residual functional capacity cannot stand.13

We note that in the District Court and on appeal, the government asserted that two Social Security rulings establish that the loss of binocular vision does not significantly erode the occupational base of jobs in the light work category. According to the government, Social Security Rulings 85-15, 1985 WL 56857, and 83-14, 1983 WL 56857, "consider the impact of visual impairments on an individual's occupational base." Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." 20 C.F.R. S 402.35(b)(1) (1999); see also Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984) (citing Social Security Ruling stating that "[o]nce published, a ruling is binding on all components of the Social Security Administration . ... . Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in

_____

13. Bowen v. Yuckert, 482 U.S. 137 (1987) , is not to the contrary. It merely upholds the requirement under step two of the five-part test in the regulation that the claimant show that he has a severe impairment, i.e., an impairment that significantly limits the ability to do basic work activities. See id. at 145. At step five, the claimant has already shown that he has limitations that have been determined to be severe in this sense.

determining other cases where the facts are basically the
same. A ruling may be superseded, modified, or revoked by
later legislation, regulations, court decisions or rulings.").

We do not decide here whether Social Security Rulings
can serve the same function as the rulemaking upheld in
Campbell, for the ALJ did not attempt to rely on these
rulings to support the conclusion that the lack of binocular
vision does not significantly erode the occupational base for
light work. See Securities & Exch. Comm'n v. Chenery Corp.,
318 U.S. 80, 88 (1943) (judicial review of an administrative
agency requires "a judgment upon the validity of the
grounds upon which the [agency] itself based its action").14
Moreover, the cited rulings cannot be said to direct a
determination of nondisability in Sykes's case. They simply
provide factors for consideration regarding the
determination of disability.15

_____

14. Campbell held that reliance on the grids to establish the presence of
jobs in the national economy for claimants who have exertional
impairments comported with the requirements of official notice only
because "when the accuracy of those facts already has been tested fairly
during rulemaking, the rulemaking proceeding itself provides sufficient
procedural protection." 461 U.S. at 470. Sykes argues that informal
agency publications like Social Security Rulings cannot play a role
similar to rulemaking in establishing the presence of jobs in the national
economy for persons with exertional and nonexertional impairments
because, unlike the rulemaking, they are "not based on volumes of
vocational data." The government counters that the Commissioner can
properly refer to a ruling for guidance as to when nonexertional
limitations may significantly compromise the range of work that an
individual can perform. We need not resolve the issue here. While not
entirely apposite, in that we deal here with a prior agency determination
of fact, we note that in the recent case of Christensen v. Harris County,
120 S. Ct. 1655 (2000), the Supreme Court held that when an agency
issues statements of policy through opinion letters, enforcement
guidelines, or similar materials that have not been formulated either
through formal adjudication or through notice-and-comment rulemaking
(and do not represent an agency's interpretation of its own otherwise-
ambiguous regulations), such statements do not have the force of law,
though they may have the "power to persuade," id. at 1663 (quoting
Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

15. See SSR 85-15, 1985 WL 56857, at *8 ("As a general rule, even if a
person's visual impairment(s) were to eliminate all jobs that involve very

21

B. Administrative Notice

Sykes argues that the Commissioner cannot rely on administrative notice to establish that lack of binocular vision does not erode the occupational base for light work as defined under the grids. We agree that the government cannot support the ALJ's action in this case on a theory of administrative notice, though our holding does not preclude the use of administrative notice on remand or in another case.

Official notice is the proper method for agency decisionmakers to apply knowledge not included in the record. It is the administrative law counterpart of judicial notice. Both doctrines allow adjudicators to take notice of commonly acknowledged facts, but official notice is broader than judicial notice insofar as it also allows an administrative agency to take notice of technical or scientific facts that are within the agency's area of expertise. See McLeod v. Immigration & Naturalization Serv., 802 F.2d 89, 93 n.4 (3d Cir. 1986) (citing NLRB v. Seven-Up Bottling Co., 344 U.S. 344 (1953)). Section 556(e) of the Administrative Procedure Act ("APA") sets forth the requirements for official notice in the administrative law context. It provides that "[w]hen an agency decision rests

_____

good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels. However, a finding of disability could be appropriate in the relatively few instances in which the claimant's vocational profile is extremely adverse, e.g., closely approaching retirement age, limited education or less, unskilled or no transferable skills, and essentially a lifetime commitment to a field of work in which good vision is essential."); SSR 83-15, 1983 WL 31254, at *5 ("Where a person has a visual impairment which is not of Listing severity but causes the person to be a hazard to self and others -- usually a constriction of visual fields rather than a loss of acuity -- the
manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work (and medium work as well).").

22

on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary." 5 U.S.C. S 556(e).

The court in Heckler v. Campbell, 461 U.S. 458 (1983), considered whether the use of the grids in that case violated the requirements of administrative or official notice. The Court rejected the argument, explaining that the requirement of official notice serves "to provide a procedural safeguard: to ensure the accuracy of the facts of which an agency takes notice," and that notice is not required for facts established in the grids because"the rulemaking proceeding [in which the grids were promulgated] itself provides sufficient procedural protection." Id. at 470.

In Union Electric Co. v. Federal Energy Regulatory Commission, 890 F.2d 1193, 1202 (D.C. Cir. 1989), the Court of Appeals for the District of Columbia Circuit interpreted S 556(e) in light of pre-APA decisions involving due process challenges to official notice, most notably Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292 (1937). In Ohio Bell Telephone, the Ohio Public Utilities Commission adjusted the value of the utility's property downward, for ratemaking purposes, to reflect the Great Depression, which had begun in the middle of the ratemaking. As the D.C. Circuit noted, the Supreme Court did not object to the commission's notice of the Great Depression, but it objected to the commission's use of data on general economic decline to adjust rates,

> for the general decline did not show "[h]ow great the decline has been for this industry or that, for one material or another, in this year or the next." Moreover, the Ohio commission manifested a "deeper vice" by never disclosing the particular evidence on which it relied. Thus the party against which the officially noticed facts were used had no opportunity to "see the evidence or hear it and parry its effect."

Union Electric, 890 F.2d at 1202 (quoting Ohio Bell Telephone, 301 U.S. at 301-02). The D.C. Circuit thus identified two prerequisites to official notice:"First, the

23

information noticed must be appropriate for official notice. Second, the agency must follow proper procedures in using the information, disclosing it to the parties and affording them a suitable opportunity to contradict it or`parry its effect.' " Id. (quoting Ohio Bell Telephone, 301 U.S. at 302).

Union Electric itself was a case reviewing a rate approval order of the Federal Energy Regulatory Commission ("FERC"). See id. at 1194. The D.C. Circuit had no difficulty with FERC's taking notice of a change in the rate on 10-year Treasury bonds because "such information is not typically subject to dispute." Id. at 1203 (quoting Mississippi Indus. v. FERC, 808 F.2d 1525, 1568 (D.C. Cir. 1987)). The Court disapproved, however, of the Commission's procedures in using the Treasury interest rates for inferences on the cost of equity, because the procedures did "not adequately protect Union's right to `parry [their] effect.' " Id. (quoting Ohio Bell Telephone, 301 U.S. at 302). "[T]he Commission apparently assumed a linear relationship between the trend for 10-year Treasury bond rates and that for Union's cost of equity capital. Union raised substantial objections to the official notice and was therefore entitled to an opportunity to dispute the Commission's findings." Id. (citing Market St. Ry. Co. v. Railroad Comm'n of Calif., 324 U.S. 548, 562 (1945) (a hearing on officially noticed evidence must be granted so long as the requesting party can make a good showing that it can contest the evidence)).

Though we do not decide whether the Commissioner could rely on official notice to establish that the lack of binocular vision does not significantly diminish the occupational base for light work, we do note that, under Union Electric, the ALJ would have had to provide Sykes with notice of his intent to notice that fact and, if Sykes raised a substantial objection, an opportunity to respond similar to that required in Union Electric. The ALJ provided no such notice. Sykes had no opportunity here to see the evidence (if any) on which the ALJ relied to determine that the lack of binocular vision does not significantly diminish the occupational base for light work and no opportunity to challenge that conclusion in the hearing. On remand, if the ALJ intends to rely on official notice rather than additional

24

vocational evidence to establish that Sykes's nonexertional impairment does not diminish his occupational base for light work, the ALJ must provide notice to Sykes that he intends to notice that the lack of binocular vision causes no diminution in the occupation base and give Sykes an opportunity to respond.16

C. Vocational Evidence

We turn now to the question what additional evidence the Commissioner must present to meet the burden of establishing that there are jobs in the national economy that a claimant with exertional and nonexertional impairments can perform. As our survey of circuit law in footnote 11, supra, demonstrates, the courts of appeals differ in what additional evidence they require the Commissioner to present to meet this burden. Some explicitly require the testimony of a vocational expert, see, e.g., Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990) (per curiam); some require a vocational expert or similar evidence, see, e.g., Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986); and some require only that the Commissioner independently examine the additional consequences resulting from the nonexertional impairment(s), see Cooper v. Sullivan, 880 F.2d 1152, 1155–56 (9th Cir. 1989).

We have never defined what sort of evidence the Commissioner must present to meet his burden of proof (and provide the requisite notice to the claimant) when the claimant has exertional and nonexertional impairments. Upon reflection, we cast our lot with those courts of appeals that require the testimony of a vocational expert or other similar evidence, such as a learned treatise. In the absence of evidence in addition to the guidelines (excepting the option of administrative notice, see supra section III.B), the Commissioner cannot establish that there are jobs in the

_____

16. As we also have held that the ALJ must reevaluate Sykes's complaint of pain, and as the government seems to have conceded that the ALJ erred in concluding that Sykes can lift his right arm above his shoulder, the ALJ on remand must treat these impairments in a manner consistent with this opinion as well.

25

national economy that someone with the claimant's combination of impairments can perform.

D. Conclusion

The government argues that the rule we adopt today is "rigid and burdensome." We emphasize that it need not be. The Commissioner frequently relies on vocational expert testimony; he appears to have arrangements with many such experts. But, as we have held, the Commissioner can rely on evidence other than vocational expert testimony to establish that a claimant's nonexertional limitation does not diminish residual functional capacity. Moreover, we read Heckler v. Campbell, 461 U.S. 458 (1983), to leave open the question whether the Commissioner could formally notice a fact such as that the loss of binocular vision does not significantly erode the job base for light work, giving the claimant the opportunity to respond to the fact to be noticed.

The flaw in the government's argument is simple. Campbell permits the government to establish through a rulemaking rather than an individualized fact-finding the fact that there are jobs in the economy for claimants with particular types of impairments. See 461 U.S. at 467-68. But it does not permit the government to avoid its burden to establish this fact. To hold otherwise would be to eviscerate the requirement that disability hearings will be individualized determinations based on evidence adduced at a hearing. See id. at 467 (noting that the Social Security Act specifically requires both consideration of each individual's condition and that the disability determination be based on evidence adduced at a hearing).

IV.

We conclude that the government's interpretation of 20 C.F.R. Part 404, Subpart P, Appendix 2, S 200.00(e)(2) (1999) does not comport with the Social Security Act as construed by Heckler v. Campbell, 461 U.S. 458 (1983). The Commissioner cannot establish that there are jobs in the national economy that Sykes can perform by relying on the grids alone, even if he uses the grids only as a framework

26

instead of to direct a finding of no disability. 17 The judgment will therefore be reversed and the case remanded to the District Court with instructions to remand it to the Commissioner for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

17. Sykes argues that the Commissioner's position in this case amounts to non-acquiescence in our decisions in Burnam v. Schweiker, 682 F.2d 456 (3d Cir. 1982), and Washington v. Heckler , 756 F.2d 959 (3d Cir. 1985), and thus that we should reverse the Commissioner's decision and award benefits to Sykes on that basis. We do not believe that the Commissioner's position amounts to non-acquiescence."[N]on-acquiescence in Circuit law involves a determination by the agency that it will refuse to follow judicial decisions it believes are not consistent with either the statute or validly adopted agency regulations." Wilkerson v. Sullivan, 904 F.2d 826, 833-34 n.7 (3d Cir. 1990). The ALJ did not appear to be aware of our precedential rulings, and although in his submission to the Appeals Council Sykes referred to the lack of a vocational counselor, he did not cite either Burnam or Washington. Further, the Commissioner has not asserted a right not to follow Burnam and Washington, and Washington explicitly leaves open the possibility that the Commissioner may use the grids as a framework in meeting the step-five burden for a claimant with exertional and nonexertional impairments. See 756 F.2d at 967-68. Thus, the Commissioner's argument that he followed Burnam and Washington insofar as he only relied on the grids as a "framework," although unavailing, does not amount to non-acquiescence. That said, however, we note that we find utterly no excuse for the Commissioner failing even to mention Burnam and Washington in his brief, although Sykes cited and relied upon them in his opening brief.

27